IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

JODI L. DREHER,                                )
                                               )          CASE NO. 1:15CV1412
                      Plaintiff,               )
         v.                                    )
                                               )          JUDGE DONALD C. NUGENT
                                               )
                                               )          MAGISTRATE JUDGE
COMMISSIONER OF SOCIAL                         )          KENNETH S. McHARGH
SECURITY ADMINISTRATION,                       )
                                               )          REPORT & RECOMMENDATION
                      Defendant.               )

        This case is before the Magistrate Judge pursuant to Local Rule 72.2(b).  The issue before

the undersigned is whether the final decision of the Commissioner of Social Security

("Commissioner") denying Plaintiff Jodi Dreher's ("Plaintiff" or "Dreher") application for

Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act, 42

U.S.C. § 1381 *et seq*., is supported by substantial evidence and, therefore, conclusive.

        For the reasons set forth below, the Magistrate Judge recommends that the decision of the

Commissioner be VACATED, and the case be REMANDED back to the Social Security

Administration.

## I.  PROCEDURAL HISTORY

        Plaintiff filed applications for Supplemental Security Income benefits on July 10, 2012,

alleging disability due to Charcot-Marie Tooth disease and Bipolar Disorder, with an onset date

of September 1, 2011.   (Tr. 83). The Social Security Administration denied Plaintiff's

applications on initial review and upon reconsideration.  (Tr. 83-97, 120).

1

Plaintiff requested that an administrative law judge ("ALJ") convene a hearing to evaluate her application. (Tr. 125). On October 29, 2013, an administrative hearing was held before Administrative Law Judge Susan Giuffre ("ALJ"). (Tr. 29-62). Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id*). A vocational expert ("VE"), Deborah Lee, also appeared and testified. (*Id.*). On February 12, 2014, the ALJ issued a decision finding Plaintiff was not disabled. (Tr. 13-24). After applying the five-step sequential analysis,[1] the ALJ determined Plaintiff retained the ability to perform work existing in significant numbers in the national economy. (*Id.*). Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 8). The Appeals Council denied her request for review, making the ALJ's February 2, 2014, determination the final decision of the Commissioner. (Tr. 1-3).

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability." *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)     If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2)     If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3)     If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)     If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5)     Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

Plaintiff now seeks judicial review of the ALJ's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II. EVIDENCE

### A.  Personal Background Information

Plaintiff was born on January 27, 1971, and was 40 years old on the alleged onset date. (Tr. 22, 83).  Plaintiff has an eleventh grade education and is able to read, write, and communicate in English.  Plaintiff testified that she attempted to get her GED but could not pass the test.  (Tr. 33).  Plaintiff has past work as a banquet hall caterer, server, nurse's aide and production assembler.  (Tr. 22, 678).  Plaintiff lives in an apartment with her sister.  (Tr. 17, 36).

### B. Medical Evidence[2]

The medical evidence on the record relates to both Plaintiff's physical and mental impairments.  However, Plaintiff's challenges to the ALJ's findings relate primarily to her physical impairments.   Accordingly, this summary focuses on medical evidence relating to Plaintiff's physical condition during the relevant period.

#### 1.  North Coast Health Ministry

The record shows Plaintiff received medical treatment from North Coast Health Ministry ("NCHM") between January of 2012 and October of 2013.  (Tr. 736-759).  On January 24, 2012, Plaintiff went to NCHM for medication refills and examination due to headaches lasting two days.  (Tr. 747-48).  Plaintiff was examined by Marie Hudgins, CNP, who noted Plaintiff's previous diagnosis of Bipolar Disorder, and hospitalization for headache the prior year.  (*Id.*).  Plaintiff complained of pain at an intensity level of "10," that she was seeing some spots and was unable to sleep, and felt nauseous, although was able to eat and drink normally.  (*Id.*).  Plaintiff

---

[2] The following recital of Plaintiff's medical record is an overview of the medical evidence pertinent to Plaintiff's appeal.  It is not intended to reflect all of the medical evidence of record.

told Nurse Hudgins she believed the headache might be stress-related due to her joblessness and having no money, and informed her she was actively looking for work.  (Tr. 748).

Review of systems showed negative findings, except that Plaintiff was positive for frequent or significant headaches, and for significant changes in hearing, vision, or dizziness. (*Id.*).  On examination, Nurse Hudgins noted generally normal findings, including normal gait, reflexes, and sensation, but muscle tenderness to posterior occiput and neck areas.  (*Id.*).  Flexeril was prescribed for muscle spasms, with instructions to follow-up if her symptoms did not improve.  (*Id.*).

Plaintiff returned to NCHM for a Recheck on May 8, 2012, and was seen by Kristine Adams, NP.  (Tr. 745-47).  Her Problem List included Bipolar Disorder, headache, and Charcot-Marie-Tooth[3] atrophy, and records listed further diagnoses of gastroesophageal reflux disease and an upper respiratory infection.  (Tr. 746-47).  At this time Plaintiff requested a psychiatric referral, complaining of depression, fatigue, and weight gain, and told Nurse Practitioner Adams she needed an evaluation to regain custody of her 9-year-old daughter.  (Tr. 745-46).  Treatment notes also showed Plaintiff stated she had not seen a mental health professional in a long time, that she continued her medication without evaluation through NCHM, and that she was "unable to hold down a job due to her 'attitude and tardiness.'"  (Tr. 745).  Plaintiff was continued on medication for her GERD and headache, and directed to follow-up in two months.  (Tr. 746).

---

[3] "Charcot-Marie-Tooth disease, also known as hereditary motor and sensory neuropathy (HMSN) or peroneal muscular atrophy, comprises a group of disorders caused by mutations in genes that affect the normal function of the peripheral nerves.  The peripheral nerves lie outside the brain and spinal cord and supply the muscles and sensory organs in the limbs.  Disorders that affect the peripheral nerves are called peripheral neuropathies."  *Alvarez v. Comm'r, of Soc. Sec.*, No. 14-12429, 2015 WL 3932543, *4-10 (E.D. Mich. May 28, 2015) (*adopted by, remanded by, Alvarez v. Comm'r of Soc. Sec.*, No 14-CV-12429, 2015 WL 3932543 (June 26, 2015)) (*citing* http://www.ninds.nih.gov/disorders/Charcot_marie_tooth/detail_Charcot_marie_tooth.htm).

On July 1, 2012, Plaintiff went to the ER for an overdose. (Tr. 743). She followed-up with Dr. Tomsik at NCHM on July 13, 2012, at which time she stated she did not want to end her life, and that she had been feeling "whacky" on her psychiatric medication (specifically Geodon), which she had been taking for one week prior to her overdose. (Tr. 743). Dr. Tomsik listed her Active Problems as Bipolar Disorder, headache, and Charcot-Marie-Tooth atrophy, and noted she was 5'1" and weighed approximately 201 pounds (BMI of 38.13). (Tr. 741-42). Notes showed Plaintiff was not experiencing any pain at the time of examination. (Tr. 744). Dr. Tomsik updated her medication regimen (continued some and modified others), and referred her for a podiatry consultation relevant to her Charcot-Marie-Tooth atrophy. (Tr. 742-43).

On May 31, 2013, Plaintiff again returned to NCHM for a physical, and requested medication and a referral for podiatry. (Tr. 740). Kathryn Rodgers, RN, noted Plaintiff again complained of a headache, noted as a 7 on the pain scale. (*Id.*). Notes showed Plaintiff had received mental health care from Far West Center since her last visit to NCHM, but she indicated on a questionnaire that she continued to be bothered by depressive symptoms. (Tr. 739-40). Records reflected that Plaintiff was referred to Neurology and prescribed Percocet and Baclofen for pain and spasms in her back and lower extremities, related to her Charcot-Marie-Tooth disease.

On the same date, Plaintiff was examined by Barbara Lavogue, CNP, who noted she was there for a referral for worsening Charcot-Marie-Tooth disease, which was last treated a year ago at Metro, and she had not had medical care for over a year. (Tr. 737). On examination, Nurse Practitioner Lavogue noted muscle wasting in Plaintiff's bilateral lower extremities with scarring from grafts, and that, although she had braces, Plaintiff did not have footwear compatible with the braces. (*Id.*). Notes showed Plaintiff complained of increased pain in her lower extremities

and worsening back spasms, identified as "all part of [the] disease process." (*Id.*).  Nurse Practitioner Lavogue observed a non-tender and movable ganglion cyst on Plaintiff's left wrist, which she reported had been there for about a year.  (*Id.*).

Plaintiff followed-up with Nurse Practitioner Lavogue on June 18, 2013, at which time it was noted that she was feeling much better on Baclofen and Percocet, and that she was experiencing less muscle spasms.  (Tr. 755).  Plaintiff reported that she had her first physical therapy appointment scheduled for the following day, as well as a pending Neurology appointment.  (*Id*).  Treatment notes showed Plaintiff had not experienced any recent migraines, and had no complaints except needing medication refills.  (*Id.*).  Keith Armstrong, MA, noted Plaintiff reported no pain at that time.  (Tr. 758).

On October 17, 2013, treatment notes of Jennifer Andrey, CNP (also of NCHM) again showed Plaintiff had no complaints of pain, but that she was experiencing cramps and spasms in her hands, legs, and feet.  (Tr. 751, 753-54).  Plaintiff reported the cramping in her hands had been going on for a couple of years, but seemed to be getting worse.  (Tr. 751).  Treatment notes showed a history of Bipolar, headache, Charcot-Marie-Tooth atrophy, and depression (as noted from earlier examination records), as well as lower extremity weakness, gait abnormality, and impairment of balance, all noted on June 19, 2013.  (Tr. 753).  Examination showed diminished strength to fingers, and that finger to thumb created cramping.  (Tr. 751-52).  Further, notes showed Plaintiff had a long-standing issue with extremity weakness and numbness, and indicated she needed an assessment for an upcoming disability hearing.  (Tr. 752).

On October 25, 2013, Dr. Tomsik completed a Physical Capacities Evaluation.  (Tr. 761). The evaluation consisted of mainly check-box opinions, with some written explanation, and was

based on Dr. Tomsik's "chart review and personal office visit."[4]  (*Id.*).  Dr. Tomsik opined Plaintiff was limited to lifting/carrying 5 pounds occasionally to 1 pound frequently during a normal work day, and could sit for 6 hours, stand for 3 hours (with assistance as needed), and walk for 2 hours (with assistance as needed) in an 8 hour work day.  (*Id.*).  Further, Dr. Tomsik opined Plaintiff could never push/pull, climb stairs or balance, or bend/stoop; could never perform gross or fine manipulation, and would need to avoid all environmental problems and hazardous machinery.  (*Id.*).  Plaintiff additionally could rarely reach or operate motor vehicles, and would likely be absent from work more than 4 days per month due to her impairments.  (*Id.*).  Dr. Tomsik further stated that he was unsure whether Plaintiff would require an assistive device (excluding leg braces) to ambulate, but that she would benefit from such a device.  (*Id.*).  In support of his determined limitations, Dr. Tomsik noted Plaintiff experienced cramping when using thumbs in her office visit, stated generally that she has balance and gait problems, and that she has asthma.  (*Id.*).  Dr. Tomkins also estimated the description of symptoms contained in this evaluation dated prior to June of 2009.  (*Id.*).

## C. State Agency Consultants

On September 11, 2012, Plaintiff underwent an internal medicine examination at the request of the State, performed by Justine Magurno, M.D.  (Tr. 703).  The record indicated Plaintiff's chief complaint was foot issues due to Charcot-Marie-Tooth disease, which was diagnosed at age 11.  (*Id.*).  Dr. Magurno recorded a history of foot surgeries to address ongoing issues, as well as Plaintiff's complaints of significant pain due to foot calluses when she walks, less pain when she sits, numbness and nerve damage, and that she falls "a lot" on the right foot

---

[4] The undersigned finds it relevant to note that the record indicated Dr. Tomsik had one office visit with Plaintiff (although he was listed as the referring provider in multiple treatment notes where other medical staff provided treatment), and that he gave no indication as to the specific charts he reviewed prior to formulating his opinion.  (Tr. 741-43, 761).

despite braces to hold her foot up.  (*Id.*).  She further reported that the disease affected her digestive system, and that she has had surgery to pull her stomach down, as well as approximately yearly surgery to widen her esophagus.  (*Id.*).

On examination, Dr. Magurno observed that, when walking without her assistive devices Plaintiff exhibited a left foot drop and her feet landed flat.  (Tr. 704).  However, she noted use of the left brace prevented the foot drop aspect to the gait on the left, and she had a similar right brace that was at that time out for repair; Dr. Magurno opined such devices were medically necessary, and were by prescription.  (Tr. 704-05).  Further, examination showed Plaintiff could stand on her toes (but not on her heels), that she could rise from a chair without difficulty, and that she needed no help changing for the exam or getting on or off the exam table.  (Tr. 705).  Musculoskeletal exam showed Plaintiff had stable and nontender joints, affirmed her complaints of thick calluses on her feet, and showed she had limited motion at her MTP (big toe) joints.  (Tr. 705-06).

Plaintiff's Manual Muscle Testing showed mostly normal results, including no muscle atrophy or spasms, and a normal ability to pick up a coin, key, write, hold a cup, open a jar, button/unbutton, zipper, and open a door.  (Tr. 708-11).  However, examination showed some limitations in Plaintiff's range of motion in her spine, shoulder, hip, knee, and ankle.  (Tr. 709-11).  Dr. Magurno provided a medical source statement at the time of this examination.  (Tr. 706).  In her opinion, Plaintiff:  should avoid heights, ladders, and dangerous machinery; had marked limitations for covering uneven ground, marked limitation for walking and standing, and marked limitation for lifting and carrying; but no limitations for sitting or upper body use or bending observed.  (*Id.*).

Plaintiff was also evaluated, at the request of the State, by Mitchell Wax, Ph.D., on August 24, 2012.  (Tr. 676).  Under medical history, Dr. Wax noted Plaintiff reported she drops things, has trouble with balance, and falls a lot due to her Charcot-Marie-Tooth syndrome, and observed her stature as "odd," describing Plaintiff as short and stocky, with very short legs and arms.   (Tr. 677).  Dr. Wax further recorded that Plaintiff stated she had not been hospitalized for medical problems in the past three years, but that she had required two trips to the emergency room over the previous 6 months, once for a drug overdose, and once because she slammed a door on her arm due to anger.  (*Id.*).  Plaintiff told Dr. Wax she had been arrested about 10 times for disorderly conduct, trespassing, and most recently, aggravated menacing and assault, for which she was jailed for 6 months.  (*Id.*).  She also reported she was fired from all her past jobs for poor attitude and having conflicts with others.  (Tr. 678).  Plaintiff stated that she had been looking for work over the past year, but Dr. Wax opined that "[s]he cannot hold a job" due to her emotional lability and anger, noting a functioning level of 41.  (Tr. 678, 680-81).  Dr. Wax further noted Plaintiff typically did the dishes and cooked two times a week (although she stated it was hard for her to concentrate to cook), and vacuumed once a week, when asked to by her sister.  (*Id.*).

On September 21, 2011, state agency reviewing physician Diane Manos, M.D., reviewed the record and determined that there was no material change to the medical evidence of record following a previously adjudicated RFC dated April 27, 2010.[5]  (Tr. 94).  Accordingly, Dr. Manos adopted that RFC, which limited Plaintiff as follows:

> [T]he claimant has the residual functional capacity to occasionally lift ten pounds, frequently lift five pounds; she is able to stand and walk two hours in an 8-hour workday and able to sit for 6 hours of an 8-hour workday; she is able to understand, remember and carry out simple

---

[5] ALJ Pamela E. Loesel denied benefits to Plaintiff in her decision dated April 27, 2010, finding Plaintiff had not been under disability since June 18, 2007.  (Tr. 66-76).

instructions in a work-related setting she can occasionally climb ramps or stairs, but never climb ladders, ropes or scaffolds; she can occasionally balance and use foot controls; she should avoid all exposure to hazards such as dangerous machinery and heights; she can sustain minimal interaction with others and relate adequately on a superficial basis with co-workers and the public without negotiation or confrontation; she can adapt to a setting in which duties and routines are predictable and perform simple routine work without high production quotas or piece work.

(Tr. 70).  Another state agency reviewer, Steve E. McKee, M.D., also adopted this RFC after review of the record, on December 8, 2012.  (Tr. 107).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant has not engaged in substantial gainful activity since July 10, 2012, the application date.

2.  The claimant has the following severe impairments:  Charcot-Marie-Tooth disorder, attention deficit hyperactivity disorder, personality disorder, and affective disorders.

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) and meaning the claimant is able to stand and walk two hours in an 8-hour workday and able to sit for 6 hours of an 8-hour workday; she is able to understand, remember and carry out simple instructions in a work-related setting; she can occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds; she can occasionally balance and use foot controls; she should avoid all exposure to hazards such as dangerous machinery and heights; she can sustain minimal interaction with others and relate adequately on a superficial basis with co-workers and the public; and she can adapt to a setting in which duties and routines are predictable and perform simple routine work without high production quotas or piece work.

5.  The claimant is unable to perform any past relevant work.

6.  The claimant was born on January 27, 1971 and was 41 years old, which is defined as a younger individual age 18-44, on the date the application was filed.

7.  The claimant has a limited education and is able to communicate in English.

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The claimant has not been under a disability, as defined in the Social Security Act, since July 10, 2012, the date the application was filed.

(Tr. 16-23).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

## V.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might

accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387. However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI. ANALYSIS

### A. The ALJ Properly Considered the Opinion Evidence Under the Treating Source Rule

It is well-established that an ALJ must give special attention to the findings of the claimant's treating sources. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). This doctrine, often referred to as the "treating source rule," is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treating relationship with an individual are best equipped to provide a complete picture of the individual's health and treatment history. *Id.*; 20 C.F.R. §§ 416.927(c)(2), 404.1527(c)(2).

The treating source rule indicates that opinions from such physicians are entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record." *Wilson*, 378 F.3d at 544. When a treating source's opinion is not entitled to controlling weight, the ALJ must determine how much weight to assign to the opinion by

12

applying factors set forth in the governing regulations. 20 C.F.R. §§ 416.927(c)(1)-(6), 404.1527(c)(1)-(6). These factors include the examining relationship, the treatment relationship, the length of treatment and frequency of examination, supportability and consistency of the opinion, the source's specialization, and any other factors tending to support or contradict the opinion. *Id.* The regulations also require the ALJ to provide "good reasons" for the weight ultimately assigned to the treating source's opinions that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinions and the reasons for that weight. *See Wilson*, 378 F.3d at 544 (*quoting* S.S.R. 96-2p, 1996 WL 374188, at *5).

Plaintiff argues the ALJ erred in failing to assign controlling weight to Plaintiff's treating physician, Dr. Tomsik. In her analysis of the opinion evidence of record, the ALJ recognized Dr. Tomsik as a treating physician, but nonetheless assigned "less weight" to his opinion as to Plaintiff's RFC. (Tr. 21). The ALJ explained she did not give controlling weight to Dr. Tomsik's opinion because she found his statements confusing and unsupported by his longitudinal office notes. The ALJ specifically found confusing that, based on review of her medical record and a personal office visit, Dr. Tomsik opined that Plaintiff's balance and gait problems supported the RFC limitations, but that he was unsure whether she required an assistive device, and noted she would benefit from a cane, all while seeming to ignore that she had been using a cane for a year and wore necessary braces on her feet. (Tr. 21-22). Further, the ALJ assigned "great weight" to the opinions of the State Agency medical consultants. (Tr. 20).

In support of her argument, Plaintiff asserts that the ALJ was incorrect in finding that Dr. Tomsik's opinion is both contradictory and not supported by his longitudinal treatment notes. Plaintiff points to treatment records from North Coast Health Ministry and Dr. Tomsik's office, located at C16F, C17F, and C20F, and states that "[a] brief study of these [records] would show

13

that the physical capacities evaluation directly corresponds with these more objective records." (Pl. Brief p. 7).  Plaintiff further alleges that the ALJ's decision to give less weight to Dr. Tomsik's opinion was based on "an incomplete analysis of the entire record."  (Pl. Brief p. 7).

Plaintiff's argument is without merit.  The undersigned finds that the ALJ properly considered the requisite factors and provided good reasons as to her assignments of weight to the medical opinion evidence, including that of Dr. Tomsik.  She recognized Dr. Tomsik as a treating source, and considered the records over the extended course of Plaintiff's treatment at North Coast Health Ministry—both from Dr. Tomsik (who saw Plaintiff on only one occasion) and other providers at that office.  The ALJ also considered Plaintiff's self-reports and the opinion of the evaluating and reviewing state agency doctors.  (Tr. 19-22).  Although the ALJ did not specifically reference all the treatment records in the paragraph explaining the weight assigned to Dr. Tomsik's opinion, the decision as a whole provides thorough analysis of Plaintiff's medical records.  (Tr. 16-22); *see generally Bailey v. Comm'r of Soc. Sec*., 413 Fed. App'x 853, 855 (An ALJ "is not required to analyze the relevance of each piece of evidence individually.  Instead, the regulations state that the decision must contain only 'the findings of facts and the reasons for the decision.'") (*quoting* 20 C.F.R. 404.953).  Further, Plaintiff fails to point to evidence that was not considered by the ALJ in her medical source analysis.  S*ee generally Mathews v. Eldridge*, 424 U.S. 319, 336 (1976) (Plaintiff has the burden of establishing his entitlement to disability benefits).

Despite Plaintiff's assertion to the contrary, the ALJ provided sufficient explanation for the weight given to Dr. Tomsik's opinion. An ALJ's determination that evidence does not support a doctor's opinion is within her discretion.  *See Simpson v. Comm'r of Soc. Sec*., 344 Fed. App'x 181, 194 (6th Cir. 2009)* ("The ALJ is not bound to accept the opinion or theory of

any medical expert, but may weigh the evidence and draw his own inferences.'") (*quoting McCain v. Dir., OWCP*, 58 F. App'x 184, 193 (6th Cir. 2003)); *see Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("An ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding."); *see generally Rudd*, 531 F. App'x at 728 (the ALJ reserves the right to decide pertinent issues, such as the claimant's RFC, based on her evaluation of the medical and non-medical evidence).  Here, in accordance with her duty to weigh the evidence, the ALJ makes specific reference to "confusions" regarding Dr. Tomsik's opinion relating to her use of a cane, as well discounting the weight of the opinion because "he seemed to ignore the fact that she already wears braces on her feet."  (Tr. 22).  Additionally, to further undermine the more restrictive limitations in Dr. Tomsik's opinion, the ALJ recognized that, although Dr. Tomsik stated his opinion was based on "chart review and personal office visit," physical examination results from NCHM generally showed Plaintiff had normal strength, normal manipulative abilities/use of her hands, normal reflexes, sensation, and gait, and mostly normal range of motion.  (Tr. 19).  Further, the ALJ noted that, as of June 18, 2013, examination reports showed Plaintiff was feeling better, experiencing less pain, and that she was able to move around more after changes were made to her medication.  (Tr. 19, 755).

While discrediting Plaintiff's treating physician, the ALJ also properly gave good reasons in support of assigning great weight to the state agency reviewing consultants' opinions in making her RFC determination.  An "ALJ's decision to accord greater weight to state agency physicians over [claimant's] treating sources was not, by itself, reversible error.*" Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009).  Here, the ALJ clearly explained that he found the state agency opinions were consistent with the record evidence.  (Tr. 21).  Further, the

ALJ properly considered that state agency consultants "have specialized knowledge in evaluating medical impairments and the listings under the SSA standards for disability."  (*Id.*); *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) (recognizing that an ALJ may afford greater weight to a state agency consultant where appropriate, as "state agency consultants…are 'highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Social Security Act.'" (*quoting* SSR 96-6p, 1996 WL 374180, *2 (July 2, 1996)*); 20 C.F.R. 404.1527(e)(2)(i), 416.927(e)(2)(i).  Finding these medical opinions supported by substantial evidence, it was within her discretion to give greater weight to the opinions of the state agency consultants over the discredited treating source opinion.  *See Schmiedebusch v. Comm'r of Soc. Sec.*, 536 Fed. App'x 637, 649 (6th Cir. 2013) ("The ALJ retains a 'zone of choice' in deciding whether to credit conflicting evidence."); *see generally Simpson*, 344 Fed. App'x at 194; *see generally Miller*, 811 F.3d at 834.

Even assuming *arguendo* that the ALJ's justifications are not sufficient to comply with the "good reasons" rule, the error would be harmless.  When an ALJ does not give good reasons for rejecting the opinion of a treating physician, reversal and remand may not be required if the violation is *de minimis*. *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 462 (6th Cir. 2005) (*citing Wilson*, 378 F.3d at 547).  A *de minimis* violation may occur "where the Commissioner has met the goal of 20 C.F.R. § 404.1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Id.* (*quoting Wilson*, 378 F.3d at 547)).  An ALJ may meet the goal of the good reasons requirement if she indirectly attacks both the supportability of the treating physician's opinions and the consistency of those opinions with the rest of the record evidence. *See Nelson v. Comm'r of Soc. Sec.*, 195 F.

App'x 462, 470 (6th Cir. 2006). The ALJ may implicitly provide sufficient reasons for not giving a treating physician's opinions controlling weight. *Id.* at 472.

Here, the ALJ's analysis of Plaintiff's medical records provided throughout her opinion supports her conclusion that Plaintiff is not as limited as Dr. Tomsik opined. In *Nelson v. Commissioner of Social Security,* the Sixth Circuit found that the ALJ failed to give good reasons for giving the opinions of two treating physicians little weight. *Id.* Nevertheless, the ALJ's analysis of the record evidence, which included other opinion evidence contrary to the treating physicians' opinions, adequately addressed the treating physicians' opinions by indirectly attacking both their supportability and their consistency. *Id.* Similarly, here the ALJ analyzed the full record of medical evidence, and assigned great weight to the state agency reviewing medical consultants' opinions that were not as limiting as the opinion of Dr. Tomsik. Additionally, the ALJ discredited the allegations of more severe limitations personally expressed by Plaintiff, in both the evidence of record and her testimony at the hearing. Accordingly, even if the specific reasons provided by the ALJ were insufficient under the treating source rule, the ALJ's analysis of the record evidence, read in its entirety, "implicitly provides sufficient reasons for the rejection of [Dr. Tomsik's] opinion…." *Id.* at 470 (*quoting Hall,* 148 Fed. App'x at 464). Further, Plaintiff fails to point to any evidence that was not considered by the ALJ, or to show the overall decision was not supported by substantial evidence, so as to justify remand. *See generally Stacey v. Comm'r of Soc. Sec.,* 451 Fed. App'x 517, 520 (6th Cir. 2011) ("[A]n error is harmless only if remanding the matter to the agency 'would be an idle and useless formality' because there is [no] reason to believe that [it] might lead to a different result.'") (*quoting Kobetic v. Comm'r of Soc. Sec.,* 114 F. App'x 171, 173 (6th Cir. 2004)).

**B. The ALJ Committed Reversible Error When She Failed to Analyze Plaintiff's Physical Limitations under the Listings**

Although the assertions of error raised by Plaintiff do not warrant remand, this Court nevertheless finds that remand is proper due to the insufficiency of the ALJ's Listings analysis at Step Three.  At Step Three, "[a]n administrative law judge must compare the medical evidence with the requirements for listed impairments in considering whether the condition [meets or] is equivalent in severity to the medical findings for any Listed Impairment."  *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 415 (6th Cir. 2011); 20. C.F.R. Pt. 404, Subpt. P, App. 1. Where an ALJ finds a claimant's severe impairments cause both physical and mental limitations, both must be analyzed under the appropriate listings.  *Id.* at 414-16.

It is insufficient for an ALJ to generally conclude a claimant does not meet a section of the Listings without identifying the relevant Listing(s) or explaining his decision.  In *Reynolds*, the ALJ "began with his conclusion [that] 'Claimant does not have an impairment or combination of impairments which, alone or in combination, meet sections 1.00 or 12.00 of the Listings,'" and then went on to conduct a sufficient analysis of the evidence relating to her mental impairments, but provided no analysis of her physical impairments.  *Id.* at 415.  The court determined remand was necessary, concluding:

> Ultimately, the ALJ erred by failing to analyze [the claimant's] physical condition in relation to the Listed Impairments.  Put simply, he skipped an entire step of the necessary analysis.  He was required to assess whether [the claimant] met or equaled a Listed Impairment…but did not do so. …In short, the ALJ needed to actually evaluate the evidence, compare it to [the relevant section] of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review.  Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.

*Id.* at 416.

The analysis provided by the ALJ in the instant matter was even less specific than the insufficient analysis in *Reynolds*.  In *Reynolds*, the ALJ concluded that the claimant's physical

impairments did not meet section 1.00, which is applicable to musculoskeletal listings. *Reynolds*, 424 Fed. App'x at 415.  Despite giving an in-depth assessment of the claimant's mental impairments under section 12.00, the ALJ offered no further explanation as to why the claimant's physical impairment did not meet or equal any impairment under section 1.00 and its subsections.  *Id.* at 415-16.  Here, the ALJ not only failed to explicate her comparison of Plaintiff's physical impairments (caused by her Charcot-Marie-Tooth disorder) to the Listings, but she additionally failed to identify any Listing related to physical impairments.   (Tr. 17).  Rather, she discussed Listings only under section 12.00, related to mental impairments.  *Id.*

The ALJ should have provided a detailed analysis of Plaintiff's physical impairments under Listing 11.14, Peripheral neuropathies.  Courts have previously found limitations caused by Charcot-Marie-Tooth disease, determined by the ALJ as a severe impairment, are properly analyzed under subsection 11.14.  *See Alvarez v. Comm'r, of Soc. Sec.*, No. 14-12429, 2015 WL 3932543, *4-10 (E.D. Mich. May 28, 2015) (*adopted by, remanded by, Alvarez v. Comm'r of Soc. Sec.*, No 14-CV-12429, 2015 WL 3932543 (June 26, 2015)); *see generally Walters v. Colvin*, 604 Fed. App'x 643, 645, 647 (10th Cir. 2015) (upholding ALJ's finding that claimant with severe impairment of Charcot-Marie-Tooth disease did not meet or equal Listing 11.14). To meet the criteria of Listing 11.14, a claimant:

> must show she has peripheral neuropathies with "disorganization of motor function," as described in Listing 11.04(B), in spite of prescribed treatment. 20. C.F.R. Pt. 404, Subpt. P, App. 1, Listing 11.14.  Section 11.04(B) then requires evidence of "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00(C))."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 11.04(B).

*Alvarez*, at *6.  Listing 11.00(C) further explains that "persistent disorganization of motor function is generally assessed with regard to "the degree of interference with locomotion and/or

19

interference with the use of fingers, hands and arms." *Id.* (*quoting* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 11.00(C)).  In *Alvarez*, despite the ALJ's consideration of Charcot-Marie-Tooth disease (and related conditions of neuropathic pain, right trigeminal neuralgia, and fibromyalgia) under sections 1.02, 1.04, 14.06, and 14.09, the court determined the ALJ's failure to consider— or even mention—Listing 11.14 (peripheral neuropathies) with regard to these severe impairments was legal error.  *Id.* at 6-7 (*citing*, *e.g.*, *Christephore v. Comm'r of Soc. Sec.*, No.11-13547, 2012 WL 2274328, *6 (E.D. Mich. June 18, 2012)).

The ALJ's clearly erroneous Listing analysis is not harmless, and accordingly requires remand.  The *Reynolds* court explained such an error is "not harmless, for the regulations indicate that if a person is found to meet a Listed Impairment, they are disabled…[and] would receive benefits regardless of what the ALJ's conclusions would have been at Steps Four and Five."  *Reynolds*, 424 Fed. App'x at 416.  Further, "correction of such an error is not merely a formalistic matter of procedure [where] it is possible that the evidence [a claimant] put forth could meet [the relevant] listing."  *Id.*  Here, Plaintiff put forth sufficient credible evidence so as to cause the ALJ to find that Plaintiff had significant limitations in her abilities to stand, walk, climb, balance, and use her feet, as set forth by Plaintiff's RFC.  (Tr. 19)  It is irrelevant that the ALJ determined Plaintiff could work despite the limitations provided in the RFC, because comparison of these limitations to the requirements under Listing 11.14, as described above, could have supported a finding of disability, thereby negating the need to continue with an RFC analysis.  *See Reynolds*, 424 Fed. App'x at 416; *see Alvarez*, 2015 WL 3932543 at *6 (although acknowledging that a Step Three error might be harmless where the decision as a whole supports the analysis at Step Three, finding remand necessary because "a thorough discussion of the medical evidence at least [left] open the possibility that [the claimant] could be found to meet"

the requirements of the relevant Listing.) (*quoting Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006); *citing Reynolds*, 424 Fed. App'x at 416; *citing May v. Astrue*, No. 4:10CV1533, 2011 WL 3490186, *9 (N.D. Ohio June 1, 2011)).

The undersigned finds remand is proper due to the ALJ's failure to provide a sufficient analysis at Step Three, notwithstanding Plaintiff's failure to raise an objection on the issue.  As a general rule, "arguments not raised are abandoned," and are thus not properly reviewable on appeal.  *Reynolds*, 424 Fed. App'x at 416.  However, the Sixth Circuit has established that "this rule is prudential and not jurisdictional, and the requirement for specific objections may be excused 'in the interest of justice.'"  *Id.* (*citing Dorris v. Absher*, 179 F.3d 420, 425 (6th Cir. 1999); *quoting Kelly v. Withrow*, 25 F.3d 363, 366 (6th Cir. 1994)).  Additionally, the Sixth Circuit "has previously considered the issue of whether certain impairments meet or equal a listing, even though that issue had not been raised." *Id.* (*citing Gwin v. Comm'r of Soc. Sec.*, 109 F. App'x 102 (6th Cir. 2004)).  Accordingly, despite Plaintiff's failure to raise the particular objection, this Court's decision to remand the case back to the Commissioner in order to cure the ALJ's deficient Step Three listing analysis is appropriate.

## VII. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the undersigned recommends that the decision of the Commissioner be VACATED, and the case be REMANDED back to the Social Security Administration.

s/ Kenneth S. McHargh<br>
Kenneth S. McHargh<br>
United States Magistrate Judge

Date:  <u>June 7, 2016.</u>

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).